FILED ___ RECEIVED
___ ENTERED ___ SERVED ON
COUNSEL/PARTIES OF RECORD

JUL - 9 2008

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| GENE ALLEN ZARITSKY )<br>  )<br>Plaintiff, )<br>  )<br>vs. )<br>  )<br>JACKIE CRAWFORD, *et al.*, )<br>  )<br>Defendants. )<br>_____ ) | 3:07-CV-0006-JCM (VPC)<br><br>**REPORT AND RECOMMENDATION<br>OF U.S. MAGISTRATE JUDGE**<br><br>July 9, 2008 |

This Report and Recommendation is made to the Honorable James C. Mahan, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4. Before the court is plaintiff's motion for a temporary restraining order (#53), which defendants opposed (#59). Also before the court is defendants' motion to dismiss (#36). Plaintiff opposed (#40) and defendants replied (#42). For the reasons stated below, the court recommends that plaintiff's motion for a temporary restraining order (#53) be denied as moot and that defendant's motion to dismiss (#36) be granted in part and denied in part.

## I. HISTORY & PROCEDURAL BACKGROUND

Plaintiff Gene Allen Zaritsky, a *pro se* prisoner, is currently incarcerated by the Nevada Department of Corrections ("NDOC") at Ely State Prison ("ESP") (#59). Plaintiff brings his complaint pursuant to 42 U.S.C. § 1983, alleging that defendants violated his First and Eighth Amendment rights, and acted with negligence under state law (#5). Plaintiff names as defendants Jackie Crawford, former NDOC Director; Greg Cox, NDOC Associate Director of Operations; Robert LeGrand, former Lovelock Correctional Center ("LCC") Supervising Caseworker; Tami Perino, LCC Caseworker; Valaree Clifton, LCC Sergeant; "Perino," LCC Senior Correctional Officer; Brian Suwinski, former LCC Senior Correctional Officer; Lenard Vare, LCC Warden; Joyce Thompson, LCC Caseworker; "Lednhardt," former LCC Investigator; James Dirocco, LCC inmate; and John Does I-II, LCC inmates. *Id.*

In count I, plaintiff alleges that defendants Clifton, Suwinski, Perino,[1] and Thompson failed to protect him in violation of his Eighth Amendment rights. *Id.* Plaintiff claims that sometime between June 2003 and June 2004, an inmate by the last name of Dirocco assaulted him by holding a "shank" to his throat and demanding $5,000.00. *Id.* Plaintiff alleges that he informed defendant Clifton, who sent defendant Suwinski to investigate, but that both defendants threatened to put him in solitary confinement. *Id.* Thereafter, plaintiff alleges, inmate Dirocco and two other inmates sexually assaulted him on February 2, 2005, approximately ten minutes after plaintiff was placed on the same yard as Dirocco. *Id.* Plaintiff claims that he had previously complained to defendants Clifton, Perino, and Thompson about inmate Dirocco, but that Perino moved plaintiff to the same yard as Dirocco anyway.[2] *Id.*

In count II, plaintiff alleges that Investigator Leonhardt violated his First Amendment right against retaliation when, after reporting the February 2, 2005 sexual assault, Investigator Leonhardt issued plaintiff a Notice of Charges ("NOC") for allegedly filing a false report that he was sexually assaulted. *Id.*

In count III, plaintiff alleges a state claim of negligence, claiming that all defendants were negligent in failing to protect plaintiff against sexual assault, and in failing to thereafter investigate and prosecute the sexual assault. *Id.* In count IV, plaintiff alleges negligent infliction of emotional distress against all defendants based on the same allegations. *Id.* Plaintiff claims that he suffered emotional injuries and physical injuries such as tears to his anus, bruises, and abrasions. *Id.*

The Court notes that the plaintiff is proceeding *pro se*. "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th

---

[1] It is unclear whether plaintiff is referring to Tami Perino or "Perino," LCC Senior Correctional Officer.

[2] Plaintiff also alleges in count I that defendants Crawford, Cox, and Vare failed to prosecute this incident. The court dismissed plaintiff's "failure to prosecute" claim in its screening order because plaintiff has no Eighth Amendment right to see that other inmates are adequately punished (#4).

2

Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II. DISCUSSION & ANALYSIS

### A. Discussion

#### 1. Motion to Dismiss Standard

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the court must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the non-moving party. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899-900 (9th Cir. 2007). For the movant to succeed, it must appear beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Rothman v. Vedder Park Mgt.*, 912 F.2d 315, 316 (9th Cir. 1990). "As a general rule, 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688-689 (9th Cir. 2001) (*quoting Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002)). However, Rule 12 provides:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed.R.Civ.P. 12(d). "A motion to dismiss is not automatically converted into a motion for summary judgment whenever matters outside the pleadings happen to be filed with the court." *North Star Intern. v. Arizona Corp. Com'n*, 720 F.2d 578, 582 (9th Cir. 1983). Conversion to summary judgment is at the discretion of the court and the court must take some affirmative action before conversion is effected. *Swedberg v. Marotzke*, 339 F.3d 1139, 1143-44 (9th Cir. 2003).

#### 2. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994). The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of prison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

**B. Analysis**

**1. Motion for Temporary Restraining Order**

Plaintiff filed a motion for a temporary restraining order on January 9, 2008, alleging that he has suffered further retaliation since filing his complaint against LCC officials, and requesting that this court prevent NDOC from transferring him back to LCC (#53). Defendants opposed and noted that because plaintiff has since been transferred to ESP, his motion is moot (#59).[3] The

---

[3] Plaintiff resided at LCC until May 24, 2007, when he was transferred to Nevada State Prison to receive medical care (#59, Declaration of Robert LeGrand). Standard practice dictates that inmates be transferred back to the same institution where they resided prior to requiring special medical care. *Id.* Thus,

4

court agrees. Further, plaintiff states no facts and submits no evidence to support his conclusory allegation that his life would be in danger were he to be transferred to LCC. Plaintiff's motion for a temporary restraining order is denied.

**2. Motion to Dismiss**

Because the facts of this case are relevant to the issues involved in the motion to dismiss, the court briefly sets out certain facts as supported by the submitted evidence. On February 15, 2004, at the request of defendant Clifton, defendant Suwinski went to plaintiff's cell to interview plaintiff (#36, Exhibit B; *see also* #40, Exhibit A). Plaintiff reported to defendant Suwinski that sometime between February 12 and 15, 2004, an inmate named James Dirocco came into plaintiff's cell, held a prison-made weapon (a "shank") to plaintiff's neck, and stated "don't f--k with me." *Id.* Plaintiff told defendant Suwinski that he believed this incident occurred because plaintiff had recently told inmate Dirocco to "stay away from a 'youngster' on the tier." *Id.* Defendant Suwinski thereafter interviewed inmate Dirocco, who "adamantly" denied that he had experienced problems with other inmates that week. *Id.* However, inmate Dirocco's cell mate told defendant Suwinski that plaintiff and Dirocco had been upset with one another over the weekend because Dirocco had told plaintiff – in front of other inmates – that if plaintiff did not stop "talking bad" about Dirocco, plaintiff could no longer borrow Dirocco's "gay magazines." *Id.* Dirocco's cell mate surmised that plaintiff did not want other inmates to know he read "gay magazines." *Id.* Defendant Suwinski wrote in his report that he "believe[ed] I/M Dorocko (sic) may have fronted off I/M Zaritsky and I/M Zaritsky is upset." *Id.*

Housing records demonstrate that after the shank incident, plaintiff and inmate Dirocco remained in the same housing unit without any report of threats or violence until April 6, 2004, when plaintiff was transferred (#39, Affidavit of Defendant LeGrand, ¶ 8). The affidavit further notes plaintiff did not file any grievances requesting special protection from inmate Dirocco after the shanking incident. *Id.* at ¶¶ 8-9.

---

on January 8, 2008, plaintiff was returned to LCC. *Id.* Once there, plaintiff refused to move into protective segregation or a general population unit, instead, insisting on residing in LCC's medical unit. *Id.* Because of plaintiff's history and risk factor, plaintiff was transferred to ESP on February 5, 2008. *Id.*

5

On February 2, 2005, plaintiff was transferred back into the same unit as inmate Dirocco (#36, Exhibit C). On February 5, 2005, plaintiff reported that he had been sexually assaulted on February 2. *Id.* Plaintiff stated that during the attack, he recognized inmate Dirocco's voice as one the three inmates who had assaulted him. *Id.* The investigative report indicates that plaintiff told the investigator, defendant Leonhardt, that plaintiff saw inmate Dirocco upon his arrival on the unit. *Id.* Plaintiff further told defendant Leonhardt that after entering his new cell, he had his back to the door when something was draped over his head so that he could not see. *Id.* He was then sexually assaulted. *Id.* Plaintiff stated that he woke up a short time later, cleaned himself up, and reported the incident to his caseworker.[4] *Id.*

The prison sent plaintiff's sweat pants to the Washoe County Crime Lab with DNA samples from plaintiff and inmate Dirocco; however, no semen or pubic hairs were detected on the pants. *Id., see also* #36, Exhibit D. Inmate Dirocco denied that he had sexually assaulted plaintiff and stated that other prisoners blame things on him because he is a known homosexual. *Id.* Defendant Leonhardt concluded that there was no evidence that plaintiff had been sexually assaulted and issued plaintiff a notice of charges for providing false and misleading information. *Id.*

On March 12, 2005, plaintiff filed an informal grievance reporting his sexual assault by inmate Dirocco (#36, Exhibit E-1). Plaintiff noted in his grievance his complaint about the 2004 shank incident to defendant Clifton, and alleged that at the time, Clifton had informed plaintiff that nothing could be done. *Id.* Plaintiff also claimed in his grievance that inmate Dirocco threatened him after the shank incident, but plaintiff did not report it at that time for fear of another attack. *Id.*

Defendant Thompson, plaintiff's caseworker, responded to plaintiff's informal grievance by noting that plaintiff had been admitted to the infirmary on February 2, 2005, complaining of

---

[4] Defendants deny that plaintiff reported the assault on February 2, 2005. Plaintiff claims that he did report the assault to caseworker Angela Stack, who is now deceased. As a general matter, the court acknowledges that there is factual discrepancy between plaintiff's and defendants' version of events, but these issues need not be resolved at this time.

6

an anxiety attack, but not a sexual assault, and that he did not report the sexual assault until February 5 (#36, Exhibit E-1). Plaintiff's physician ultimately determined on February 5 that plaintiff suffered from anal fissures. *Id.* Defendant Thompson also informed plaintiff that defendant Clifton had no recollection of plaintiff's 2004 report of the shank incident and stated that Clifton "is an experienced and excellent staff member and would not have taken this report lightly." *Id.* Defendant Thompson further stated that after plaintiff reported the sexual assault, the prison investigated the 2004 shank incident with every staff member on every unit in which plaintiff had been incarcerated, and that no one remembered it. *Id.*

Plaintiff's first and second level grievances accuse defendant Clifton of lying to cover her own mistakes, and state that defendant Suwinski would testify on plaintiff's behalf (#36, Exhibit E-2). Defendant Vare responded similarly to defendant Thompson, stating that he had "reviewed this carefully" and found no evidence of the shanking incident. *Id.* Defendant Vare further stated that had the shanking incident occurred, the prison would have "carefully reviewed and addressed" such a report. *Id.*, Exhibit E-2.

### a. Official Immunity

Defendants first argue that they may not be sued in their official capacities (#36). The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit... against one of the United States by Citizens of another State... ." U.S. Const. amend XI. The Supreme Court has held that a suit against a state official in his or her official capacity is not suit against that official, but rather a suit against the official's office; therefore, an official acting in his or her official capacity is not a "person" under section 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Since the state and its officials are not considered "persons" within the meaning of section 1983, "they cannot be held liable under the statute for money damages." *Bank of Lake Tahoe v. Bank of America*, 318 F.3d 914, 918 (9th Cir. 2003). However, when a state official is sued in his official capacity for prospective injunctive relief, he is considered a "person" for the purposes of section 1983. *Doe v. Lawrence Livermore Nat. Laboratory*, 131 F.3d 836, 839 (9th Cir. 1997).

Plaintiff names defendants in their individual and official capacities (#5). In his request

for relief, plaintiff asks for "damages in excess of $10,000," attorney fees, costs and disbursements. *Id.* As plaintiff may not sue state officials in their official capacities for money damages, plaintiff's claims against all defendants in their official capacities are dismissed.

### b. Defendant LeGrand

Defendant LeGrand argues that plaintiff has not alleged that he had any personal involvement in any of the alleged violations (#36, p. 11). Plaintiff submits a copy of defendant LeGrand's affidavit which states that when he acted as the Correctional Casework Specialist III at LCC, he was "responsible for the supervision of LCC's casework staff" (#40, Exhibit A-1).[5]

A person deprives another of a constitutional right for the purposes of section 1983 if that person "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which that person is legally required to do that causes the deprivation of which complaint is made." *Hydrick v. Hunter*, 466 F.3d 676, 689 (9th Cir. 2006) *quoting Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). There must be a causal connection by some kind of direct personal participation in the deprivation or by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury. *Id.* Supervisory officials are not liable for the actions of subordinates under a vicarious liability theory pursuant to 42 U.S.C. § 1983 unless "the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001).

Plaintiff makes no allegations in his complaint that defendant LeGrand acted to violate his constitutional rights; indeed, plaintiff alleges no facts in relation to defendant LeGrand and merely names him as a defendant. Even if defendant LeGrand was the supervising caseworker at the time of the shanking incident, there are no allegations that defendant LeGrand "participated in or directed the violations, or knew of the violations and failed to act to prevent them." Defendant LeGrand's motion to dismiss is granted.

---

[5] Plaintiff also argues in his opposition that he had conversations on the yard with defendant LeGrand regarding the issues that are the subject of plaintiff's complaint (#40, p. 3). As defendants correctly point out, plaintiff did not make this allegation in his complaint and the court disregards it.

8

**c. Exhaustion**

Defendants next argue that while plaintiff may have reported the 2004 shanking incident, he failed to thereafter file any grievances stating that he was in fear of inmate Dirocco; thus, plaintiff failed to exhaust his administrative remedies such that defendants were not provided with the opportunity to protect plaintiff (#36, p. 10).

The Prison Litigation Reform Act of 1996 ("PLRA") amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2002). The exhaustion of administrative remedies is mandatory. *Booth v. C.O. Churner*, 532 U.S. 731 (2001). All available remedies must be exhausted before a complaint under section 1983 may be entertained. *Id.* at 738. Those remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter v. Nussle*, 534 U.S. 516, 524 (2002), *citing Booth*, 532 U.S. at 739-40, n.5. Even when the prisoner seeks remedies not available in the administrative proceedings, notably money damages, exhaustion is still required prior to filing suit. *Booth*, 532 U.S. at 741. Case law demonstrates that the Supreme Court has strictly construed section 1997e(a). *Id.* at 741, n.6 ("[w]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"). However, an inmate's failure to comply with the exhaustion requirements in section 1997e(a) does not deprive the federal court of jurisdiction. *Rumbles v. Hill*, 182 F.3d 1064, 1068 (9th Cir. 1999), *overruled on other grounds in Booth v. Churner*, 532 U.S. 731 (2001).

The Supreme Court has recently held that the PLRA requires "proper" exhaustion of administrative remedies. *Woodford v. Ngo*, 548 U.S. 81 (2006). "Proper" exhaustion is defined as "using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* at 90 (citations omitted). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the court of its proceedings." *Id.* at 90-91.

1   The court first notes that after the alleged 2005 sexual assault, plaintiff properly exhausted his administrative remedies as to his failure to protect claim. Thus, the prison was given the opportunity at that time to resolve plaintiff's claim for damages that they failed to protect him.

The court next notes that it is not able to analyze the grievance system requirements as the parties have not submitted a copy of the relevant NDOC Administrative Regulation.

Finally, it strikes the court as unfair, at this early stage in the litigation, to grant defendants' motion on the grounds of failure to exhaust. The evidence reveals that in 2004, plaintiff complained about another inmate threatening his life with a prison-made knife, but that officials in charge did nothing to remedy the situation. This inaction occurred despite the fact that inmate Dirocco's cell mate independently confirmed that plaintiff and inmate Dirocco had been fighting that weekend. There is no evidence that either defendant Clifton or Suwinski further investigated this incident. There is no evidence that the prison instituted a lock-down and searched inmate cells or the yard for the weapon.[6] Plaintiff claims that after he realized that the prison was not going to do anything about the incident, he was too scared to report a second threat from inmate Dirocco in spring 2004, prior to his transfer. Plaintiff also alleges that he informed his caseworker prior to his transfer back onto inmate Dirocco's unit in 2005 that he was afraid of inmate Dirocco, but that his caseworker did nothing in response (#5, p. 4). These are issues of fact. The court questions whether it is plaintiff's duty to continually report that he is afraid of

---

[6] Defendants argue that Suwinski's report indicates that inmate Dirocco's cell was searched after plaintiff reported the shank incident (#42, p. 2, citing #36, Exhibit B). The court disagrees that the report contains such information.

Further, plaintiff submits the August 2, 2007 declaration of Ronald Halstead, who, at the time of his declaration, was the Associate Warden of Operations at LCC (#40, Exhibit A-2). It is not clear whether this declaration was drafted for this or another case. Mr. Halstead sets out the protocol officers are required to follow when an inmate reports seeing a shank or any other prison-made weapon. *Id*. Halstead declares that any such report is taken "very seriously" because it would indicate that the safety and security of the institution was in jeopardy. *Id*. Upon receipt such a report, typically the prison would place the entire unit on lock-down, would conduct a thorough search of the inmate's cell, and would search the entire yard for weapons. *Id*. Additionally, Halstead states that all inmates would be subject to health and welfare checks and officers would send any inmates involved in incidents to medical. *Id*. "[A]t a minimum," an incident of this nature would be noted in the unit log and an incident report would be issued. *Id*. Halstead further declares that any officer who failed to take these steps after receiving a report of a prison-made weapon would be "subject to disciplinary action." *Id*.

10

another inmate and that he was attacked and threatened, especially when it appears the prison failed to follow its own rules.

In addition to the above reasons, the court concludes that it will not dismiss plaintiff's claims on exhaustion grounds because when plaintiff filed grievances after the alleged sexual assault in 2005, the prison, through defendants Thompson and Vare, denied that the 2004 shank incident had ever occurred. Clearly, it had, as is evidenced by the incident report. Defendants do not explain this inconsistency. The court surmises that the prison's records were likely poorly kept and the shank incident poorly documented. However, because this case is very early in its proceedings and the parties have not yet had a chance to conduct discovery in a meaningful way, it is possible that other documents exist to support plaintiff's claims that the prison was on notice of this issue. Such documents may include a caseworker's report in relation to plaintiff's transfer back into inmate Dirocco's unit in 2005 or grievance forms that have been overlooked. Thus, plaintiff will be allowed to develop any arguments, including any additional supporting facts, that he may have in opposition to defendants' defense of failure to exhaust. Defendants' motion to dismiss on exhaustion grounds is denied without prejudice to re-assert its argument in the future.[7]

### d. Qualified Immunity

Defendants argue that they are entitled to qualified immunity because the evidence reveals that they acted reasonably under the circumstances (#36, p. 6). When a constitutional violation occurs, law enforcement officers nonetheless are entitled to qualified immunity if they act reasonably under the circumstances. *KRL v. Estate of Moore*, 512 F.3d 1184, 1186 (9th Cir. 2008) (citing *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). A qualified immunity analysis begins with a threshold question of whether, based upon facts taken in the light most favorable to the party asserting the injury, an official's conduct violated a constitutional right. *Saucier v. Katz*,

---

[7] Defendants cite *Johnson v. Johnson*, 385 F.3d 503 (5th Cir. 2004) in support of their contention that plaintiff failed to exhaust administrative remedies. The court reviewed *Johnson* and notes that the parties in that case were at a later stage of the proceedings procedurally. Unlike the present case, ample evidence existed in *Johnson* to make a determination that Johnson had failed to exhaust some of his failure to protect claims. In a case such as the present one, where the allegations are of serious physical harm at the hands of defendants' deliberate indifference, the court errs on the side of the *pro se* plaintiff at the motion to dismiss stage.

11

533 U.S. 194, 201 (2001). If no constitutional right was violated, the court need not inquire further. *Id.* If a constitutional violation has occurred, the court's second inquiry is to ask whether the law was "clearly established" at the time of the violation. *Id.* This is a question of law for the court. *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995). If the court determines that the law was clearly established at the time of the alleged violation, the final inquiry is whether the official could nevertheless have reasonably, but mistakenly, believed that his or her conduct did not violate the plaintiff's constitutional rights. *Sloman v. Tadlock*, 21 F.3d 1462, 1467 (9th Cir. 1994). The court must examine the "'information possessed' by the [state official] to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal." *Inouye*, 504 F.3d at 712 (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The reasonableness determination is also a question of law, unless there are issues of fact as to what the official knew and when. *Sinaloa Lake*, 70 F.3d at 1099.

Although the government is "entitled to raise the qualified immunity defense immediately, on a motion to dismiss the complaint," *see Kwai Fun Wong v. U.S.*, 373 F.3d 953, 956-57 (9th Cir. 2004), at the motion to dismiss stage, the court looks only at whether the law is clearly established and whether the plaintiff has alleged sufficient facts to constitute a violation of established law. *Hydrick v. Hunter*, 500 F.3d 978, 985 (9th Cir. 2007). Taking the facts in plaintiff's complaint as true, plaintiff has alleged that defendants violated his Eighth Amendment rights and that defendants failed to act reasonably. It has been clearly established for quite some time such that a reasonable officer would understand that "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Because the right is clearly established, and the plaintiff sufficiently alleged a colorable violation of constitutional rights, the court concludes that defendants are not entitled to qualified immunity at the motion to dismiss stage. The court denies defendants' motion to dismiss on qualified immunity grounds.

///

///

### e. Discretionary Qualified Immunity

Finally, defendants argue that they are entitled to discretionary qualified immunity with respect to plaintiff's state negligence claims in counts III and IV (#36, p. 7). Nevada Revised Statue ("NRS") 41.032 concerns Nevada's qualified waiver of sovereign immunity for state actors. Section two "provides absolute immunity to state actors who are sued in connection with the 'exercise or performance or the failure to exercise or perform a discretionary function or duty.'" *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1059 n. 1 (Nev. 2007) (quoting NRS 41.032(2)). In *Butler*, the Nevada Supreme Court set out the test for analyzing claims of discretionary-act immunity by stating:

> [A]cts are entitled to discretionary-function immunity if they meet two criteria. First, the disputed act must be discretionary, in that it involves an element of judgment or choice. Second, even if an element of judgment or choice is involved, the court must determine if the judgment is of the kind that the discretionary function exception was designed to shield, *i.e.*, actions based on considerations of social, economic, or political policy. The focus of this second inquiry is not on the employee's subjective intent in exercising the discretion conferred ... but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Butler*, 168 P.3d at 1066 (internal citations and quotations omitted). Certain discretionary acts do not fall within the scope of discretionary-act immunity "because they involve 'negligence unrelated to any plausible policy objectives.'" *Id.* (citing *Martinez v. Maruszczak*, 168 P.3d 720, 728 (Nev. 2007)). This analysis is on a case-by-case basis and is fact dependent, and courts must keep in mind that the purpose of the discretionary-immunity exception is to prevent courts from second guessing legislative and administrative policy decisions. *Id.* at 1066-67.

In *Butler*, the Nevada Supreme Court held that NDOC prison officials were not entitled to immunity from suit pursuant to NRS 41.032(2). NDOC officials had released a quadriplegic prisoner – who could not speak or write and who essentially functioned at a ten-year-old level – into the custody of an ex-girlfriend who was not at all prepared to care for him. *Id.* at 1060. Prison officials had been in touch with Mr. Butler's ex-girlfriend, and although she lived in a trailer that was not equipped for a handicapped individual, she reluctantly agreed she would install a ramp, hospital bed, and other medical equipment and would "try" to take care of him.

13

1  *Id.* When prison officials arrived with Mr. Butler, none of these accommodations had been made.
2  *Id.* Despite their misgivings that the ex-girlfriend would be able to lift Mr. Butler, the officers
3  left him there. *Id.* Two weeks later Mr. Butler was hospitalized because he was seriously
4  malnourished, dehydrated, and had an electrolyte imbalance. *Id.* The court held that while the
5  decision to release the prisoner on parole and "the formulation of any overarching prison policies
6  for inmate release" are both "policy decisions that require analysis of multiple social, economic,
7  efficiency and planning concerns," the act of leaving Mr. Butler at his ex-girlfriend's house –
8  where is was clear a paraplegic's needs could not be met – was "not based on the consideration
9  of any social, economic, or political policy." *Id.* at 1067.

10  Defendants argue that all of plaintiff's claims against them are based on discretionary acts,
11  specifically, defendant Suwinski's decision not to investigate any further and not to separate
12  plaintiff from inmate Dirocco (#36, p. 8). It is true that these actions involved defendant
13  Suwinski's judgment and choice not to pursue the shank matter. However, the court finds that
14  this judgment is not the kind that the discretionary-function exception was designed to shield.
15  There is no evidence that defendants Suwinski and Clifton acted, or in this case, failed to act,
16  based on social, economic or political policy considerations. In fact, plaintiff's evidence – the
17  Halstead declaration – indicates that defendants did not follow NDOC policy concerning the
18  report of a shank, despite the fact that failure to follow protocol upon report of a weapon will
19  result in disciplinary action. *See* # 40, Exhibit A-2.

20  Based upon the small amount of evidence before the court, these actions appear to fall into
21  the *Martinez* category of acts not within the immunity scope "because they involve 'negligence
22  unrelated to any plausible policy objectives.'" *Martinez v. Maruszczak*, 168 P.3d 720, 728 (Nev.
23  2007). Defendants are not entitled to discretionary-act immunity, and the court denies their
24  motion to dismiss on these grounds.

25  ///
26  ///
27  ///
28  ///

14

### III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that:

1. Because plaintiff has been transferred to ESP, his request for a temporary restraining order to prevent transfer to LCC is moot;

2. Plaintiff may not sue state officials in their official capacities for money damages;

3. Even if defendant LeGrand was the supervising caseworker at the time of the shanking incident, there is no evidence that defendant LeGrand "participated in or directed the violations, or knew of the violations and failed to act to prevent them;"

4. There is not enough evidence before the court to dismiss plaintiff's claims for failure to exhaust his administrative remedies, and the court declines to do so prior to discovery among the parties;

5. Dismissal on qualified immunity grounds is not proper because the law is clearly established and plaintiff has sufficiently alleged a violation of his constitutional rights; and

6. Defendants are not entitled to discretionary-act immunity pursuant to NRS 41.032 because they were not acting based on social, economic or political policy considerations.

As such, the court recommends that:

1. Plaintiff's motion for a temporary restraining order (#53) be **DENIED AS MOOT**; and

2. Defendant's motion to dismiss (#36) be **GRANTED** as to all defendants in their official capacities and entirely as to defendant LeGrand, and **DENIED** as to all other claims and defendants.

The parties are advised:

1. Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt. These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

///

## IV. RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that plaintiff's motion for a temporary restraining order (#53) be **DENIED AS MOOT**;

**IT IS FURTHER RECOMMENDED** that defendant's motion to dismiss (#36) be **GRANTED** as to all defendants in their official capacities and entirely as to defendant LeGrand, and **DENIED** as to all other claims and defendants.

**DATED:** July 9, 2008.

_____
UNITED STATES MAGISTRATE JUDGE